THE PALMER ELECTRIC & MANUFACTURING CO. *vs.* UNDERWRITERS' LABORATORIES, INC.

Suffolk.   May 15, 1933. — December 9, 1933.

Present: CROSBY, WAIT, FIELD, & LUMMUS, JJ.

*Contract*, Implied.   *Damages*, In contract.

A corporation established and maintained by a national board of fire underwriters for the purpose of examining, testing and classifying devices and materials used in buildings, with respect to the degree of danger of bodily injury or of fire resulting from their use, and of reporting the results to fire insurance companies and to the manufacturers and producers of such devices and materials, maintained for subscribers a label service, in which devices and materials which met its tests were entitled to carry a label with a certain legend.   Electric switches were within this service, and a classification denominated AA was made to designate switches "enclosed in metal cases, operable without opening cases, and so designed and constructed that they cannot be installed or used so as to expose normally current carrying parts to contact by persons replacing or inspecting fuses."   Against the protest of a subscriber who was the sole manufacturer of switches satisfying the AA classification, the corporation gave permission to use that label to a second manufacturer whose product included a device for engaging and disengaging the switch by the moving of a disk outside a closed front of an enclosing metal case in such a way that, when the switch was engaged and the current was on, there was no visible access to the interior of the case, and when the switch was disengaged and the current was off, access both to the view, and safely with implements, could be had through holes in the disk corresponding to holes in the cover of the metal case; sometimes, however, if the cover of the metal case were not closed tightly enough, a moving of the disk would not disengage the switch and yet would cause the holes to appear, thus leading the user to

think that access to the interior was safe when it was not. The switches were intended for the use of ordinary householders, many of whom were not familiar with switches or fuses. The first subscribing manufacturer brought a suit in equity against the corporation maintaining the label service to enjoin it from permitting the second manufacturer further to use the label. While the suit was proceeding, the second manufacturer changed its product so that it complied with the AA classification, and the first manufacturer then sought to maintain the suit for the assessment of damages which he had suffered by reason of unreasonable competition permitted by the defendant through an improper use of its label. *Held,* that

(1) The switch which competed with the plaintiff's was not entitled to the AA classification because it could be "installed or used," within the wording of that classification, with its cover improperly secured, thus exposing normally current carrying parts to contact by persons replacing or inspecting fuses;

(2) There was at least an implied contract by the defendant to use reasonable care and diligence to secure and maintain a substantial compliance with its own standards applicable to classification AA and to confine the use of AA labels, so far as it might reasonably do so, to devices which did comply with such standards;

(3) Such implied contract was broken by the defendant and, as a result of such breach, the plaintiff unreasonably was subjected during the whole period in question to the competition of substandard switches bearing the defendant's AA label;

(4) The plaintiff was entitled to damages.

In the suit in equity above described the plaintiff was held to be entitled as damages to loss of profits on sales which he would have made had the defendant not permitted competition by the maker of the substandard switches.

The plaintiff in the suit above described was not precluded from recovering damages by the fact that the competition of the second manufacturer did not cause a reduction in the price of the plaintiff's commodity, nor by the fact that a master, who heard the suit on the question of damages, found that, if the defendant had done its duty by withdrawing the AA label from the competing switches, the manufacturer of them would have redesigned them within six months so as to bring them within classification AA, and the plaintiff's monopoly would have been short lived.

BILL IN EQUITY, filed in the Superior Court on February 7, 1928, and described in the opinion.

The suit first was heard only on the question of liability by *Greenhalge,* J., the evidence being fully reported. Afterwards it was referred to a master on the question of damages. Material findings by the judge and by the master are stated in the opinion.

After the filing of reports by the master, the suit was

further heard by the judge. His rulings are stated in the opinion. A final decree dismissing the bill was entered. The plaintiff appealed.

*R. G. Dodge,* (*J. M. Raymond* with him,) for the plaintiff.

*W. L. Fisher* of Illinois, (*A. A. Schaefer* with him,) for the defendant.

LUMMUS, J. The defendant is an Illinois corporation, established and maintained by the National Board of Fire Underwriters for the purpose of examining, testing and classifying devices and materials used in buildings, with respect to the degree of danger of bodily injury or of fire resulting from their use, and of reporting the results to fire insurance companies and to the manufacturers and producers of such devices and materials. The classification made by the defendant has become of importance to manufacturers and producers of many kinds of devices and materials, because public authorities frequently require the use of a particular class of goods, according to the defendant's classification, and architects, builders and other buyers frequently specify goods of such a class. The insurance companies who maintain the defendant do not expect or receive any direct profit from it. It has never paid a dividend. Its charges to manufacturers and producers for its services are intended merely to defray the cost of operation. Yet there is nothing to show that the function of the defendant is charitable, or that it acts solely in the public service. If through its efforts fire losses are reduced, as is hoped, the insurance companies save money, and there is nothing to show that premiums are reduced to such a degree as to cancel the saving.

One service offered by the defendant is called the label service. Devices and materials which meet the tests of the defendant for a certain class may be marked by means of labels purchased from the defendant so that they may be recognized as of that class wherever found. The manufacturer or producer must buy labels to a certain amount each year. Early in 1917 the defendant adopted and published classifications of electric switches which as modified in 1918 read as follows: "*Classification A.* Switches enclosed in metal cases, operable without opening cases, and so designed

and constructed that, when properly connected, fuse terminals must be dead at all times while they are exposed for inspection or replacement. *Classification B.* Switches enclosed in metal cases and operable without opening cases." About that time the plaintiff, or rather its predecessor, a Maine corporation of the same name, to whose business, assets and rights the plaintiff succeeded on September 20, 1927, began to take the label service as to the electric switches which it manufactured.

Shortly after the plaintiff began to take the label service in 1917, it became involved in a controversy with the defendant over the inclusion in classification A of competing switches made by other manufacturers, which the plaintiff contended were not entitled to such inclusion. A compromise was effected in 1918, by which the defendant created a new third class, called classification AA, consisting of "Switches enclosed in metal cases, operable without opening cases, and so designed and constructed that they cannot be installed or used so as to expose normally current carrying parts to contact by persons replacing or inspecting fuses." When this classification was adopted and published, switches made by the plaintiff were the only type eligible for classification and labelling under it. Classification AA was intended to provide for a safer switch than either of the other classifications.

The plaintiff contends that the defendant subsequently allowed a competing manufacturer to use the AA classification and label for switches that did not comply with the defendant's specification of that classification. The period in controversy is from April 1, 1924, until November 1, 1928, when the competing switches clearly became entitled to that classification. The competition was felt only in the cities of Cambridge, Providence, Philadelphia and Havana, in each of which, for the whole or a part of the period in question, electric light companies required the use of AA switches.

The plaintiff, on February 7, 1928, brought this bill for an injunction and damages. It concedes that the classification AA was properly ended at the end of the year 1928, and now seeks only damages. The case was heard, upon

the question of liability only, by a judge of the Superior Court, who reported material facts and entered an interlocutory decree referring the question of damages to a master.

In the competing switches the blades, which engage in jaws to make the connection which permits electric current to flow through the switch into the building, were mounted in a porcelain part called a "rotor," which turned in an arc of ninety degrees from the left, the "on" position, to the right, the "off" position. In the rotor were two "terminals" or receptacles for fuses, through which the electricity passed in going through the switch. The rotor and the switch jaws were enclosed in a metal case, the front of which dropped down, exposing the entire switch. Ordinarily the front of the case was up, and was sealed to the top, preventing access to the switch, except in the manner to be described, so long as the seal remained unbroken. Attached to the outside of the front of the metal case was a metal disc, which could be operated by a handle through the same arc as the rotor. When the case was properly sealed, the disc had a means of engagement with the rotor, so that both turned together. When the handle was turned to the left, the switch blades engaged the jaws, the electric current passed through the switch, and no opening appeared in the metal case through which the fuse receptacles or any other part of the switch could be reached or seen. But when the handle was turned to the right, the switch blades were disengaged from the jaws, the current ceased to flow, holes in the disc appeared opposite holes in the metal case and also opposite the fuse receptacles in the rotor, and through these holes the fuses could be inspected or replaced with safety. This access, in our opinion, did not prevent such a switch from being "operable without opening cases" within the meaning of classifications AA, A and B. Neither do we perceive error in the denial by the trial judge of liability for permitting too little space between live parts and the enclosing case or cover, in the competing switches, in alleged violation of other parts of the defendant's requirements for all enclosed switches. As this involves no

principle of law, but relates merely to the finding of facts from evidence, we see no need for demonstration or discussion. *Norcross* v. *Mahan*, 283 Mass. 403.

A defect was found in these competing switches, with respect to the exposure of live parts to contact by persons replacing or inspecting fuses. Sometimes the front of the metal case did not close tightly enough to cause the disc to engage the rotor. In some switches this might result from sealing through a hole provided for a padlock and not through the hole intended for sealing. Where this defect existed the turning of the handle would not move the rotor. If the rotor should be in the "on" position, and the disc should be turned into the "off" position, the holes in the disc and the metal case would permit access to the interior of the switch, though not to the fuse receptacles. The switches were intended for the use of ordinary householders, many of whom were not familiar with switches or fuses. In the language of classification AA, "normally current carrying parts" would be exposed to contact "by persons replacing or inspecting fuses," even though no fuse or fuse receptacle would be visible in such a case. An ignorant householder, seeing no fuse or fuse receptacle, might explore the interior of the switch to the depth of about three inches with the finger or some tool, and thereby get an electric shock. It is true that the defect just described could not exist while the switch was operating as a switch, turning the current on and off. But it seems to us undue refinement to say that when the defect existed the switch was not "installed or used." Notwithstanding the defect, the switch was capable of being "installed or used" as far as appearances and the belief of the persons involved were concerned. The defect might be produced in some switches by faulty resealing after a perfectly proper installation. If the protection afforded by classification AA were not to attach unless the switch actually operated as a switch, an AA switch would be no safer than an A switch, for an A switch was perfectly safe "when properly connected." An AA switch was to be one that "cannot" be "installed or used" so as to be unsafe.

The trial judge ruled "that the word 'installed' as used in the defendant's classification AA and in the interlocutory decree appointing the master and designating the purpose of the reference, should be construed to mean: — to set up or fix in position the apparatus referred to for use or service as a switch, and upon this construction" he concluded "from the facts set forth in the master's report and supplemental report after recommittal that the plaintiff has suffered no damage by reason of any acts or omissions of the defendant." Having so ruled, the court dismissed the bill with costs. The plaintiff appealed. The evidence before the judge, on his preliminary hearing as to liability before referring the case to the master on the question of damages, is before us, but the evidence before the master has not been reported.

We think, for reasons already stated, that the judge was wrong in ruling, as apparently he did rule, that the competing switches were entitled to the AA classification because, notwithstanding the defect stated, they could not be "installed or used" as switches so as to expose live parts to contact. We think, further, as the judge found after his preliminary hearing on the question of liability, that there was "at least an implied obligation resting upon the defendant to use reasonable care and diligence . . . to secure and maintain a substantial compliance with its own standards applicable to classification AA and to confine the use of AA labels, so far as it may reasonably do so, to devices which do comply with such standards." This implied contract was broken, for during the whole period in question the plaintiff unreasonably was subjected to the competition of substandard switches, bearing the defendant's AA label. The plaintiff, in our opinion, is entitled to damages.

What are the damages? Although the competition did not cause a reduction in price, it caused loss of profits on sales which the plaintiff would have made had the defendant not permitted competition by makers of substandard switches. *Manufacturing Co.* v. *Cowing*, 105 U. S. 253. True, the master finds that if the defendant had done its duty by withdrawing the AA label from the competing switches, the

manufacturers of them would have redesigned them within six months so as to comply with the specifications, and the plaintiff's monopoly would have been short lived. But this finding is a speculation as to a state of affairs that never arose. The fact was, that throughout the period in controversy the defendant permitted competition in violation of its contract, while the plaintiff's switches were the only ones entitled to the highest classification. We think that the damages must be computed according to the fact, and amount, as the master finds, to $77,914.10, computed as of November 1, 1928. See *Bills* v. *New York Central Railroad*, 84 N. Y. 5, 13, 14. *Piper* v. *Kingsbury*, 48 Vt. 480, 486. *Central Trust Co. of Illinois* v. *Chicago Auditorium Association*, 240 U. S. 581, 593, 594. *Wier* v. *American Locomotive Co.* 215 Mass. 303. To this should be added interest from November 1, 1928. The final decree should be reversed, and a final decree entered for the plaintiff in accordance with this opinion, with costs.

*Ordered accordingly.*